1

2

3

4

5

6

7

8

9

10

11

12

13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:23-cr-143 |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS |
| v. | |
| CHRISTIAN J. HEBERT, | |
| Defendant. | |

## 1.  INTRODUCTION

Defendant Christian J. Hebert argues he was too impaired to waive his *Miranda* rights knowingly, intelligently, and voluntarily before making statements to law enforcement after his arrest. Before the Court is his motion to suppress his post-arrest statements. The Government opposes the motion, and an evidentiary hearing was held on February 14, 2024. For the reasons discussed below, Hebert's motion is granted.

14

15

16

17

18

19

20

21

22

23

1

## 2.  DISCUSSION

**2.1  Legal standard.**

Before the police may interrogate a criminal suspect in custody, they must first advise them of their *Miranda* rights: "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). An individual may waive their *Miranda* rights, however, "provided [that] the waiver is made voluntarily, knowingly and intelligently." *Id.* at 444. "There is a presumption against waiver," which the Government may overcome by showing "by a preponderance of the evidence" that the defendant knowingly and voluntarily waived their *Miranda* rights. *United States v. Crews*, 502 F.3d 1130, 1139–40 (9th Cir. 2007). "To meet this burden, generally, the Government must prove that, under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of such abandonment." *Id.* at 1140. The Ninth Circuit has identified several factors to consider when determining whether there was a valid *Miranda* waiver:

> (i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system.

*Id.*

1

2   Intoxication alone will not render a *Miranda* waiver invalid, but it may

3   preclude a finding of voluntariness if the defendant is so intoxicated that their

4   waiver is not "the product of a rational intellect and a free will." *Medeiros v.*

5   *Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (citation omitted).

6       "If the Government cannot establish the 'requisite level of comprehension,'

7   the statements must be suppressed." *United States v. Ruiz-Hernandez*, No. CR22-

8   0197JLR, 2023 WL 8472805, at *2 (W.D. Wash. Dec. 7, 2023) (quoting *Moran v.*

9   *Burbine*, 475 U.S. 412, 421 (1986)).

## 2.2    Hebert's motion to suppress.

10      Relying heavily on the arresting officer's testimony—Federal Protective

11  Service (FPS) Officer Michael Lorah—the Government claims Hebert was "alert and

12  coherent" when he waived his *Miranda* rights. Dkt. No. 35 at 1. According to Officer

13  Lorah, he read Hebert his *Miranda* rights in English, and Hebert waived his rights.

14  Officer Lorah testified that Hebert spoke without difficultly or confusion in

15  answering a series of questions that followed. FPS Officer Stephen Lindsay

16  confirms that Officer Lorah Mirandized Hebert, but that he ignored Hebert and

17  Officer Lorah's exchange and thus could not testify about specific details of the

18  interrogation. Officer Lindsay testified that he asked Hebert two questions, which

19  Hebert answered with one-word responses.

20      Officers Lorah's and Lindsay's testimony might otherwise be the end of the

21  story, but there is an added detail here: there's over 30 minutes of video footage

22  capturing Hebert's condition, ending just minutes before he allegedly waived his

23

constitutional rights.[1] The videotape tells a starkly different story and contradicts the FPS officers' description of Hebert's condition. Far from being alert and coherent, the video shows Hebert "on the nod," as his retained medical expert put it. *See* Exs. A-8; A-17. The timeline is important here.

On August 23, 2024, Officer Lorah observed Hebert smoking what he believed to be fentanyl near federal offices between 10:10 to 10:15 a.m. Officer Lorah tried to identify Hebert, but Hebert denied having identification, a name, or date of birth. Officer Lorah tried to arrest Hebert, but Hebert spun away and ran. Officer Lorah chased him and a scuffle ensued, during which Officer Lorah used his taser on Hebert, first shooting the taser's probes and then using it in "drive-stun" mode. Officer Lorah tased Hebert three or four times and eventually subdued him. See Ex. A-18.

Officer Lorah called for backup following the chase and alleged altercation around 11:20 a.m., and SPD and FPS officers, including Officer Lindsay, showed up soon after. This is when the video begins—the SPD officers wore body cameras that recorded their interactions with Hebert and the FPS officers. *See* Exs. A-3; A-4. Hebert is seen seated on a concrete block, slouched over at the waist. During the video, he leans over further and further until his head is between his knees and resting on the concrete block. At one point, Officer Lindsay props up Hebert, but Hebert leans back over almost immediately.

---

[1] The Government does not argue or claim the videotape, Exs. A-3 and A-4, was doctored or altered in any way, nor that it depicts something other than what is shown in the video footage.

ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS - 4

Because it was obvious that Hebert was under the influence of drugs, an SPD officer asked Hebert questions like:

"Do you get what's going on here, sir?"

"Do you understand what's happening?"

"Are you still so out of it you can't talk, or are you just not wanting to tell us?" Ex. A-3. Another SPD officer asked Hebert:

"Can you talk?"

"Are you aware of my presence?"

"Are you here with me?"

Ex. A-4. Hebert moaned at one point, but he responded to none of their questions with words.

While he was slumped forward, an SPD officer grabbed Hebert's hand to scan his fingerprints, but Hebert's hands and fingers were limp and he did not register the officer's touch. FPS officers helped Hebert to his feet and walked him slowly to the street where they waited for a Seattle Fire Department (SFD) EMT firefighter. Once they arrived on the sidewalk near the street, Hebert sat down with his head slumped forward once again. The video ends just as the medic arrived at 11:06 a.m. *See* Ex. A-5.

The medic asked Hebert several background questions, but he did not respond. She took his vitals and determined that they were in the "normal" range, and that he was "alert," which in context, meant that Hebert wasn't unconscious. The medic's report notes "unknown if oriented," referring to Hebert. SFD's medical evaluation lasted roughly five minutes, ending around 11:11 or 11:12 a.m. *See* A-5.

ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS - 5

1    Officer Lorah placed Hebert in the back seat of his patrol car and read Hebert his

2    *Miranda* rights at 11:14 a.m.

3            Thus, less than 10 minutes elapsed from the end of the SPD video to when

4    Hebert received a *Miranda* warning and waived his rights. The Court finds that

5    Hebert's condition did not improve enough during this time to consider his waiver to

6    be made with full awareness of both the nature of the right being abandoned and

7    the consequences of the decision to abandon it. *See Crews*, 502 F.3d at 1140.

8            This conclusion is supported by the testimony offered at the hearing and the

9    evidence in the record. First, Dr. Souders—Hebert's retained medical expert with an

10   anesthesiology, pain medicine, and addiction medicine background—testified that,

11   on a more probable than not basis to a reasonable degree of medical certainty,

12   Hebert was suffering from acute fentanyl intoxication based on her review of the

13   video and his records. Exs. A-5, A-17. The effects of Hebert's intoxication included

14   drowsiness and confusion, among other things, that affected his cognition and

15   perception. She testified that based on the timing of his ingestion, Hebert would

16   have been suffering from acute fentanyl intoxication at the time of his *Miranda*

17   waiver.

18           Second, U.S. Marshal Service Security Officer Plamen Hristov testified that

19   when he booked Hebert that same day at the U.S. District Courthouse around 12:15

20   p.m., Hebert appeared under the influence and displayed patterns of opioid abuse.

21   Officer Hristov testified that while Hebert complied with his directives, he was

22   confused and unable to understand everything taking place.

23

ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS - 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Finally, Assistant Federal Public Defender Gregory Murphy testified compellingly that Hebert was slumping over and falling asleep when they met in lockup and that Hebert was too impaired to proceed with his initial appearance. *See* A-1. In Murphy's nearly 20 years as a defender, he could not recall postponing a client's initial appearance because they were too impaired to understand the importance of the proceedings.

Yes, some of the *Crews* factors are present—Hebert has had prior run ins with the law, and he was advised about his rights in English, his native tongue—but the Court finds that Hebert's mental condition was so diminished that his waiver was not the product of a rational mind.[2] *See Medeiros,* 889 F.2d at 823; *see also Colorado v. Connelly,* 479 U.S. 157, 164 (1986) (the mental condition of the defendant is the key factor in determining voluntariness). Thus, given the totality of the circumstances, the Court finds the Government has not proven by a preponderance of the evidence that Hebert's *Miranda* waiver was knowing, intelligent, and voluntary.

---

[2] The Court makes no findings about the effects of the taser strikes on Hebert. The study performed by Hebert's expert Dr. Michael White offers evidence that taser strikes affects cognitive functions, but his study was performed under controlled conditions on mentally and physically healthy subjects. *See* Ex. A-12. This was a chaotic scene and Hebert was not mentally or physical sound. Dr. White argues that the typical criminal defendant would fare worse than his test subjects, but he offers no observed effects of the use of Conducted Energy Weapons on individuals who are under the influence or otherwise impaired. So the Court does not afford Dr. White's report and testimony much weight under these circumstances.

ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS - 7

### 3.  CONCLUSION

In sum, Hebert's motion is GRANTED and his post-arrest statements are suppressed. Dkt. No. 30.

Dated this 16th day of February, 2024.

Jamal N. Whitehead
United States District Judge

ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS - 8